Littleton, Judge,
delivered the opinion of the court:
The Quapaw Tribe of Indians has appealed to this court from a final determination of the Indian Claims Commission adverse to that tribe’s claim contained in Count I of its petition (immemorial occupancy and possession), and also from the Commission’s determination allowing certain offsets in the sum of $48,592.73 from the amount found to be due the tribe in connection with Count II. The Government has filed a cross appeal from the Commission’s final determination in favor of the tribe under Count II, with respect to a treaty reservation.
COUNT i
Count I is asserted under Section 2 (3) of the Indian Claims Commission Act (60 Stat. 1049, 25 U. S. C. 70) on the ground that the consideration provided for in the treaty of August 24, 1818, 7 Stat. 176, and paid by the United States to the Quapaw Tribe for 43,520,888.24 acres of land embraced in a general cession of any right, title or interest, to the United States by the tribe, was grossly inadequate and unconscionable within the meaning of the Act.[2] The tribe asks for a revision of the treaty as to the price for *48 this general cession. The Indian Claims Commission made and entered findings of fact and rendered an opinion and determined that appellant-tribe was not entitled to recover on this Count I, because the tribe had not established by-sufficient evidence that it had exclusively possessed and occupied from time immemorial, and at the time of the 1818 cession, all or any definable part of the large area included in the general cession.
The appellant-tribe urges that the Commission has erred ;in that its findings of fact contain only ultimate facts as distinguished from basic or primary facts, as requested by the tribe in its proposed findings, and that in any event the ultimate findings made and the decision of the Commission are not supported by substantial evidence. From a careful examination of the record we cannot agree with appellants, and from a study of the record we find that the findings of the Commission are sustained by substantial evidence.
In finding 1 the Commission found that the Quapaw Tribe ■was first discovered by the DeSoto Expedition, in 1541, ■along the west bank of the Mississippi River, extending from the vicinity of the St. Francis River south to the Arkansas River, with a few of the tribe residing on the east side of the Mississippi; that around the year 1700, the entire tribe was on the area west of the Mississippi with the tribe’s principal village located at the confluence of the St. Francis and Mississippi Rivers; that the tribe then began moving •southward, and by the year 1805 was located along the south bank of the Arkansas River in several villages extending from the junction of the Arkansas and the Mississippi Rivers for a distance of about one hundred miles to the vicinity of what is now known as Little Rock, Arkansas; that they remained between Little Rock and Arkansas Post, the latter being, about 15 miles west of the Mississippi River, until the time of the treaty of August 24, 1818; that the population of the tribe had diminished from 5,000 or 6,000 members in 1541, to approximately 500 members at the time of the .1818 treaty. They had therefore ceased to occupy and possess and use much of the area occupied in the Indian manner many years before.
*49 In finding 2, the Commission found that in 1818 the United States wished to acquire- some of the lands claimed by the Quapaw west of the Mississippi to provide a home for other Indians then living east of that river; that the Secretary of War appointed two commissioners to treat with the Quapaw for the extinguishment of their use and occupancy, claims except such land as might be reserved by treaty for their occupancy and use; that pursuant to instructions issued by the Secretary of War, the Treaty Commissioners concluded a treaty with the Quapaw Indians on August 24, 1818 (7 Stat. 176), by which the Quapaw ceded and relinquished to the United States all their claims to lands both east and west of the Mississippi, except for a reservation of 1,163,604.75 acres. This tract consisted of the area which the Commission believed was sufficient for the needs of the tribe and which they also found was the area which the tribe at the time of the treaty in 1818 had and for many years past, occupied and used in such fashion as to show Indian use and occupancy right, the fee title having always been in the United States.
In its third finding, the Commission found that in 1818 the Quapaw were occupying an undefined territory within the boundaries of the 1,163,604.75 acres of the lands reserved by Article 2 of the treaty and further found, from the whole record, that the tribe did not at that time and had not for many years past actually occupied and exclusively possessed any part of the 43,520,888.24 acres of land described in and ceded and relinquished by the treaty. Indian tribes, in the absence of a treaty reservation, have only an occupancy and use title, or right, the fee being in the United States, and when an Indian tribe ceases for any reason, by reduction of population or otherwise, to actually and exclusively occupy and use an area of land clearly established by clear and adequate proof, such land becomes the exclusive property of the United States as public lands, and the Indians lose their right to claim and assert full beneficial interest and ownership to such land; and the United States cannot be required to pay therefor on the same basis as if it were a recognized treaty reservation. Johnson and Graham’s Lessee v. William M’Intosh, 8 Wheat. 543 (5 U. S. 503); Cramer v. United *50 States, 261 U. S. 219; United States v. Santa Fe Pacific Railroad Co., 314 U. S. 339; Northwestern Bands of Shoshone Indians v. United States, 95 C. Cls. 642; Coos Bay Indian Tribe et al. v. United States, 87 C. Cls. 143; Alcea Band of Tillamooks et al. v. United States, 103 C. Cls. 494, 541-563.
We find that the findings and conclusions of the Indian Claims Commission on Count I of appellants’ claim are supported by substantial evidence. The Commission’s findings and decision are, therefore, affirmed.
COUNT n
In its second cause of action appellant-tribe sought recovery on the ground that the amount paid by the Government to the tribe for its 1818 treaty lands sold to the Government by the treaty of November 15, 1824 (7 Stat. 232), was grossly inadequate within the meaning of clause (3) of Section 2 of the Indian Claims Commission Act. The Commission found that the Indians received, under this treaty, $28,037 for 1,161,284.75 acres of the reservation acquired by the Government, or 2.4 cents per acre, whereas the true value of this land in 1824 was 85 cents per acre. The Commission concluded, and we think correctly upon the record, that the sum paid was grossly inadequate and determined that the tribe was entitled to an award of $987,092 less such offsets, if any, as might be allowable.
The Government has cross-appealed from the Commission’s determination on Count II, assigning as errors (1) the Commission’s failure to hold that the Quapaw Indians had waived their right to claim fraud in the execution of the 1824 treaty, by entering into the treaty of May 13, 1833 (7 Stat. 424), under which it accepted substantial benefits conferred by that new or “supplementary” treaty, and (2) in the alternative, in not taking into consideration the sums paid under the 1833 treaty in making its determination of whether or not the terms of the 1824 treaty were unconscionable.
Both of defendant’s contentions are based upon the premise that the treaties of 1824 and 1833, were not two separate transactions but rather one, the 1833 treaty being supplemental to or in modification of the 1824 treaty.
*51 Pursuant to the 1824 treaty, the Quapaw ceded to the United States the lands formerly reserved to their exclusive occupancy and use in the 1818 treaty and agreed to move to a district of country inhabited by the Caddo Indians in Oklahoma and to form a part of that tribe. As pointed out by the Commission, the United States was not required by the 1824 treaty to provide the Quapaw with any land in the Caddo country and did not do so, for the land the Quapaw moved to and occupied therein was given to them by the Caddo Indians. In Article II of the 1824 treaty, the Government granted the Quapaws a temporary annuity of one thousand dollars a year for 11 years to be “in addition” to their present annuities. (See Article V of the 1818 treaty providing for a perpetual annuity of $1,000 a year;) In Article V of the 1824 treaty the Government agreed to furnish the Quapaws up to $1,000 to be expended by their agent, to facilitate the transportation and movement of the Tribe to the Caddo country, and also to furnish the Quapaws with corn, meat and salt for six months from January 1,1826 (the tribe agreed to commence its move on January 20, 1826). A tract of land was reserved out of the 1818 reservation to one James Scull in consideration of the Quapaw’s debt of $7,500 to him, and certain tracts of land from the Quapaw reservation in Arkansas were granted to other persons of Indian descent. The Commission found that the Government performed all its obligations under the 1824 treaty. (Finding 14 of the Commission’s Additional Findings of Fact, entered January 8,1952.)
The preamble to the treaty of May 13, 1833, between the Quapaw Indians and the United States, relates the circumstances leading up to the negotiation of this treaty. It states that in accordance with their promise in the 1824 treaty, the Quapaws removed to the Caddo district and settled on land given them by the Caddo on the Bayou Treache on the south side of the Bed Biver; that the land was found to be subject to frequent inundations so that the Quapaw crops were destroyed; that the country was unhealthy and many of the Quapaws died as a result; that since the Qua-paws could obtain no substitute land from the Caddos who refused to take them into their tribe, the Quapaws had “no *52 alternative but to starve and perish, if they continued there, or to return to their old residence on the Arkansas;” that upon returning to their old residence on the Arkansas, “they now find themselves very unhappily situated in consequence of having their little improvements taken from them by the settlers of the country; and being anxious to secure a permanent and peaceable home the following articles or treaty are agreed upon between the United States and the Quapaw Indians by John F. Schermerhorn * *
The treaty then provided for the cession by the Quapaws to the United States of whatever right and title and interest they had to the lands “given them by the Caddo Indians on the Bayou Treache of Bed Biver.” Article II provided that the United States would convey to the Quapaws one hundred and fifty sections of land west of Missouri between the lands of the Senecas and Shawnees, to be selected for them by the Commissioners of Indian Affairs West. In Article III the United States agreed, “in consideration of the important and extensive cessions of lands made by the Quapaws to the United States and in view of their present impoverished and wretched condition,” that the Quapaws should be moved to their new homes at the expense of the United States and would be supplied with one year’s provision from the time of their removal. In the same article the Government agreed to furnish cows and other farm animals, as well as farm implements, blankets, rifles, etc., and to provide a farmer for their instruction, a blacksmith and blacksmith shop. The Government also agreed to appropriate a thousand dollars a year for the tribe’s education. In Article IV, it was provided that in lieu of and in full consideration for the Qua-paw’s present annuities, “perpetual and limited,” [3] the Government would pay the debts of the Quapaw Indians in accordance with a schedule annexed to the treaty and would give them an annuity of $2,000 a year for twenty years.
Article V of the treaty contains the language on which the Government principally relies in urging that the 1833 treaty was in reality a part of the 1824 treaty. That article provides in part as follows:
*53 It is hereby agreed, and expressly understood, that this treaty is only supplementary to the treaty of 1824, and designed to carry into effect the views of the United States in providing a permanent and comfortable home for the Quapaw Indians * * *.
The permanent and comfortable home which the Quapaw tribe had under the 1818 treaty had been taken from them.
We do not think that the above statement is controlling on the question of whether the 1833 treaty was a mere addition to the 1824 treaty. The 1833 treaty may have been supplemental to the 1824 treaty in attempting to carry out the Government’s desire to see the Quapaws settled in a permanent and adequate home outside of Arkansas, a plan which was not fulfilled because of the facts already described and noted in the preamble to the 1833 treaty. However, as the Commission has pointed out, each specific provision of the 1824 treaty was completely carried out by both parties and in all material respects the 1833 treaty was an entirely new and separate agreement and transaction.
The United States was under no legal obligation to do anything further under the 1824 treaty or to make any supplemental agreement with respect to it. In the 1824 treaty the Government bought and paid a certain sum for lands belonging to the Quapaw in Arkansas. In the 1833 treaty it took a conveyance of the Quapaw lands in Oklahoma and paid something for such lands by conveying the Quapaw lands owned by the Government in the northeastern corner of the Indian Territory and in the southeastern corner of Kansas. In the 1818 treaty the Quapaws received a perpetual annuity, and in the 1824 treaty this was “supplemented” by a limited annuity to run only for eleven years. In the 1833 treaty the tribe gave up both annuities in return for a 20-year annuity. The 1833 treaty provided considerably more in the way of goods and services for the Quapaws than had the 1824 treaty. We can only suppose and therefore conclude, in the light of the record, that the Government considered the consideration passing from the tribe to it to have been most adequate, that is, the Caddo lands in Oklahoma and the giving up of the perpetual annuity.
In view of all the circumstances surrounding the negotiation of the 1833 treaty and the 1824 treaty, and the actual *54 terms of the two treaties, we agree with the Commission that the two treaties were separate and distinct and that the 1824 treaty was in all material respects completely executed by the time the 1833 treaty was entered into. We accordingly affirm the Commission’s conclusion that only the sum of $28,037 may be regarded as the consideration paid for the reserve lands (under the 1824 treaty) ; and we agree with the Commission that such consideration was unconscionable in view of the true value of the land which the Commission found to have been $987,092. This finding and conclusion of the Commission are, in our opinion, fully supported by substantial evidence.
OFFSETS
Section 2 of the Indian Claims Commission Act makes the following provision respecting offsets:
In determining the quantum of relief the Commission shall make appropriate deductions for all payments made by the United States on the claim, and for all other offsets, counterclaims, and demands that would be allowable in a suit brought in the Court of Claims under section 145 of the Judicial Code (36 Stat. 1136; 28 U. S. C. sec. 250), as amended; the Commission may also inquire into and consider all money or property given to or funds expended gratuitously for the benefit of the claimant and if it finds that the nature of the claim and the entire course of dealings and accounts between the United States and the claimant in good conscience warrants such action, may set off all or part of such expenditures against any award made to the claimant, except that it is hereby declared to be the policy, of Congress that monies spent for the removal of the claimant from one place to another at the request of the United States, or for agency or other administrative, educational, health or highway purposes, or for expenditures made prior to the date of the law, treaty or Executive Order under which the claim arose, or for expenditures made pursuant to the Act of June 18, 1934 (48 Stat. 984), save expenditures made under section 5 of that Act, or for expenditures under any emergency appropriation or allotment made subsequent to March 4,1933, and generally applicable throughout the United States for relief in stricken agricultural areas, relief from distress caused by unemployment and conditions resulting therefrom, the prosecution of public work and public *55 projects for the relief of unemployment or to increase employment, and for work relief (including the Civil Works Program) shall not be a proper offset against any award.
In determining what amounts expended by the United States on behalf of appellant-tribe should be allowed as offsets, the Commission has sought to apply the provisions of the Indian Claims Commission Act set forth above, this court’s rule in the case of Sioux Tribe v. United States, 105 C. Cls. 725,[4] and the rules suggested by this court in The Menominee Tribe of Indians v. United States, 118 C. Cls. 290.[5]
We have examined the items disallowed as offsets by the Commission and in each instance we agree with the disposition made by the Commission.
We turn now to those items allowed by the Commission as offsets and to appellant-tribe’s objections to such allowances.
In finding 18, the Commission found that defendant had paid to or expended for appellant tribe $13,450 pursuant to Article 2 of the treaty of November 15, 1824, including $7,450 as annuities, $4,000 in merchandise and goods, and $2,000 in payments to chiefs. These items constitute “payments made by the United States on the claim” and are allowable offsets under Section 2 of the Indian Claims Commission Act.
*56 In finding 14, the Commission found that defendant had paid to or expended for appellant-tribe $12,408.19 pursuant to Article 5 of the treaty of 1824, including $3,558.73 for pay of interpreters, $500 for pay of a sub-agent, $1,000 for removals and $7,349.46 for meat and salt. Appellants object to the allowance of the last item for meat and salt on the ground that the treaty provided that meat and salt would be furnished for six months from January 1, 1826, whereas $6,950.29 for such purposes were paid in 1825 from an appropriation entitled “Annuities, Quapaw Indians,” and the balance in 1832,1833 and 1835, and therefore could not have been payments “on the claim.”
The Act of March 3, 1825 (4 Stat. 92, 93), contained an item of $15,372 “For the purchase of provisions for six months, as provided for by the fifth article of said treaty,” the treaty in question being that of November 15, 1824. By the Act of March 2,1829, 4 Stat. 348, 349, $2,000 was authorized for the same purpose. By the Act of June 15, 1832, 4 Stat. 532, an additional thousand dollars was appropriated “for provisions for' the Quapaws, by act of second March,” 1829.
From the above it appears that the total amount of $7,-349.46, expended for “meat and salt,” was pursuant to Article 5 of the 1824 treaty and, as such, was a payment “on the claim” and therefore an allowable offset from the judgment on the claim.
In finding 16, the Commission allowed as an offset $5,-552.36 expended by the United States for the benefit of the tribe for provisions in the years 1836, 1881 and 1882. Although the Quapaw treaty of May 13, 1833 (7 Stat. 424), provided (Article III) that the United States would supply the tribe with provisions for one year from the time of removal, these particular expenditures were not made pursuant to that treaty obligation, or, as far as the record shows, to any other treaty obligation. Accordingly, as held by the Commission this appears to be a proper offset.
The Commission also allowed as an offset $1,558.35 which the Commission stated was gratuitously expended for the benefit of plaintiffs in 1867, 1869, 1872, 1873, 1874 and 1875, *57 in providing them with provisions. In its opinion the Commission noted that this sum was for “provisions in lieu of farmer” and referred parenthetically to the report of the General Accounting Office, pp. 121 and 122. The Commission stated:
Just why the expenditures were thus carried is difficult to understand because there were apparently no farmers employed after the year 1863, at least no expenditures for that purpose are shown in the report. It may be fairly concluded, however, that the expenditure was for subsistence and not required by the treaty [1833] after the year 1835. We, therefore, allow the amount as a gratuity. [Italics supplied.]
In the same finding, the Commission allowed as an offset $2,400 expended during the years, 1869, 1870 and 1871, as “cash payments to chiefs and council in lieu of farmer,” and commented in its opinion as follows:
* * * We believe this sum must be allowed because it no doubt was to compensate the Quapaw chiefs and council for their services in representing the tribe, which services were presumably of benefit to those Indians. The defendant was under no obligation to pay them and should be reimbursed for the outlay.
The finding makes reference to the G. A. O. report, pp. 120, 121.
Turning to the G. A. O. report, p. 88 (our future page references are to the G. A. O. Report), on offsets, Statement No. 7, entitled “Disbursements made by the United States for the benefit of the Quapaw Tribe of Indians pursuant to the Treaty of May 13, 1833, 7. Stat. 424,” we note that $15,072.01 was expended as “Pay of farmers,” apparently under Article III of that treaty. There is also shown the above item of $1,558.35 identified as “Provisions in lieu of farmer,” and the other item of $2,400 identified as “Cash payments to chiefs and council in lieu of farmer.” (See pp. 88, 89, G. A. O. report.) Prom the. appropriate disbursement schedules later in the report, we note that during 1864, 1865 and 1866, no sums were disbursed for pay of farmers. In the following, years beginning in 1867, however, there were disbursements for “Provisions in lieu of *58 farmer” and also for “Cash payments to chiefs and council in lieu of farmer.” Part III, Section D of the report, contains information relative to disbursements made by the United States for the benefit of the Quapaws pursuant to the Treaty of February 23, 1867, 15 Stat. 513. This treaty was negotiated with a number of tribes including the Qüa-paws to meet a situation created by the Civil War, wherein the homes of the tribes were destroyed and the members driven from their reservations. The tribes agreed to sell portions of their lands, to live on the diminished reserves, and have the proceeds of the sale of their lands invested in a permanent annuity. Article XI, respecting the Quapaw Tribe, provided:
The amount now due and unpaid [1863-1867] for a farmer, under the provisions of the third article of their treaty of May thirteen one thousand eight hundred and thirty-eight [three], may be used by the chiefs and council for the purchase of provisions, farming implements, seed, and otherwise for the purpose of assisting the people in agriculture; and their annual income now paid for farmer shall hereafter be set apart for the purposes of assistance and improvement in agriculture.
At page 191 of the G. A. O. report, it is stated:
Article 11 [XI] of said treaty provides for the disposition of amounts due and unpaid the Quapaw Tribe for a farmer under Article 3 of the Treaty of 1833. Disbursements of said amounts were made during the years 1867 to 1876 and are set out under Article 3 of the Treaty of 1833 (see pp. 88, 89).
Under the Act of July 26, 1866, 14 Stat. 255, 263, there was appropriated for the fiscal year 1867, $600 “For farmer during the pleasure of the President, per third article treaty thirteenth May,” 1833. An identical provision appeared in the appropriation Act of March 2, 1867, 14 Stat. 492, 506. In the next appropriation Act, that of July 27,1868,15 Stat. 198, 213, the following appears:
Quapcmos. — * * *
For farmer, during the pleasure of the President, per third article treaty thirteenth May, eighteen hundred and thirty-three, six hundred dollars: Provided, That this sum of six hundred dollars, together with any un- *59 expended balance heretofore appropriated for the employment of a farmer, may be used in the purchase of such articles of food and clothing as may be thought necessary in the discretion of the Secretary of the Interior.
In the appropriation Act of April 10,1869,16 Stat. 13,30, $600 was appropriated “For farmer, during the pleasure of the President, per third article treaty thirteenth May,” 1833. In the Act of July 15, 1870, 16 Stat. 335, 349, $2,660 was appropriated “to be expended in such goods, provisions, and other articles as the President may from time to time determine, including insurance and transportation thereof, in instructing in agricultural and mechanical pursuits, in providing employees, educating children, providing medicine and medical attendance, care for and support of the aged, sick, and infirm, for the helpless orphans of said Indians, and in any other respect to promote their comfort, civilization, and improvement * * The Act of March 3, 1871, 16 Stat. 544, 559, appropriated $2,660 for the identical purpose. The Act of May 29, 1872, 17 Stat. 165, 179, appropriated $600 “For one farmer, during the pleasure of the President.” The Act of February 14, 1873, 17 Stat. 437, 452, contained an identical provision. The Act of June 22, 1874,18 Stat. 146,163, also contained an identical provision.
From the above facts, it seems clear that the expenditures by the United States for provisions in lieu of farmer, and in cash payments to chiefs and council in lieu of farmer, were made in fulfillment of the Government’s obligations under Article III of the 1833 Treaty, as further specifically authorized in Article XI of the Treaty of February 23,1867 (15 Stat. 513), and as such are not proper offsets. The Commission’s determination allowing these amounts as offsets is accordingly reversed.
In finding 17, the Commission found that the United States, without any treaty or contractual obligations so to do, expended gratuitously for the benefit of the tribe from November 15,1824, to June 30,1946, public funds in the total amount of $34,412.72, and that each item making up such total is a properly allowable offset to the defendant. We shall consider each item separately.
*60 AGRICULTURAL IMPLEMENTS AND EQUIPMENT, 1879 TO 1901-?1,653.28
In the Menominee case, supra, expenditures for agricultural implements and equipment were disallowed as offsets on the ground that they were for the purpose of demonstration and were educational, in the absence of any showing by defendant as to just what was their purpose. We have examined the report of the General Accounting Office concerning these items, beginning at page 233, the applicable disbursement schedules and the acts of Congress under which the funds were expended. Some of the amounts were expended from the Osage Civilization Fund (Treaty of September 29,1865,14 Stat. 681), which was established “for the education and civilization of Indian tribes residing within the limits of the United States.” (Article I of Treaty of September 29, 1865.) Other amounts were expended from appropriations for “contingent expenses” of the Indian service, including traveling and incidental expenses of Indian agents, and of their offices, and related expenses. Still other amounts were expended under appropriations “For education and civilization of Indians within the limits of the late Central Superintendency, including clothing, food and lodging for the children attending school.” We find nothing in the G. A. O. report which indicates that these funds used to purchase agricultural implements and equipment were for purposes other than educational within the meaning of the Indian Claims Commission Act, as interpreted in the Menominee case, and accordingly are not proper offsets. The Commission’s determination allowing $1,653.28 as an offset, is therefore reversed.[6]
*61 CLOTHING, 1833 TO 1894-$249.41
The Commission has allowed as an offset $249.41 expended from 1833 to 1894. Turning to the G. A. O. report, we note that the first item making up this total was $4.50 (p. 254) expended in 1824 under the Act of May 26,1824, 4 Stat. 36, making appropriation for the military service. Inasmuch as the treaty under which the claim arose was not negotiated until November 1824, this was an expenditure made prior to the date of the treaty under which the claim arose and may not be offset under Section 2 of the Indian Claims Commission Act.
The next item is in the amount of $24 (p. 243) and was expended under the Act of July 14, 1832, 4 Stat. 595, “An Act to provide for the appointment of three commissioners to treat with the Indians, and for other purposes.” The purpose of this commission was to treat with the Indians west of the Mississippi, with a view to finding land on which to settle the emigrant tribes then residing east of that river. The Quapaws were west of the river. In the absence of any further showing, it appears that the $24 expended under that act for clothing must have been for the benefit of the United States and for the purpose of “carrying the provisions of this act into effect”. We see no basis for allowing this amount as an offset.
The next item for clothing is in the amount of $48 (p. 270) and was expended under the Act of February 17, 1879, 20 Stat. 295, 313, for the education and civilization of the Indians of the Central Superintendency “including clothing, food, and lodging for the children attending school.” This expenditure would appear to be clearly for educational purposes. and therefore not a proper offset.
In 1882, $6.15 was expended pursuant to the Act of March 3, 1881, 21 Stat. 485, 499; in 1883, 10 cents was expended under the Act of May 17, 1882, 22 Stat. 68, 83; and in 1885, $35.18 was expended under the Act of July 4, 1884, 23 Stat. 76, all for the same purpose as in the preceding paragraph. These amounts do not represent proper offsets.
In 1892, $107.48 (p. 246) was expended under the Act of March 3, 1891, 26 Stat. 991, and, in 1894, $24 was expended *62 (p. 247) under the Act of March 3, 1893, 27 Stat. 612, 614, for contingent expenses of the Indian Service, including travel and incidental expenses of Indian agents, of their offices, and related expenses. Such expense was in fact an agency or administrative expense and therefore not subject to offset under the Indian Claims Commission Act.
In view of what we have said above, the Commission’s determination allowing defendant to offset $249.41 expended for “clothing” is reversed.
EXPENSES OF INDIAN DELEGATIONS — $468.56
The first three items making up the total, were expended-under appropriation acts in 1825 (p. 254), 1830 and 1831 (p. 244), providing for “contingencies” for the Indian department. The last item was expended under the Act of July 26, 1866 (p. 265), 14 Stat. 255, 256, from a fund authorized “for provisions for Indians.” These expenditures do not appear to fall within any of the exceptions enumerated in Section 2 of the Indian Claims Commission Act. Therefore, if we find that either the nature of the claim or the entire course of dealings and accounts between the United States and the tribe warrants such action, such expenditures may be set off. We find nothing in this record to warrant the disallowance of these items, and accordingly the determination of the Commission is affirmed.
FUEL AND LIGHT-$29.10
The report of the G. A. O., referred to by the Commission in connection with this amount, reveals that it consists of two items totaling $29.10. The first item was expended in 1882 ($15.50, p. 271) under the Act of March 3, 1881, 21 Stat. 485, 499; and the other ($13.60, p. 272) under the Act of July 4,1884,23 Stat. 76, 90, both “for education and civilization of the Indians within the limits of the late Central Superintendency, including clothing, food and lodging for the children attending school * * *.” This expenditure appears to be for the purpose of education (heating and lighting the school) and therefore is not a proper offset under the provisions of the Indian Claims Commission Act. The Commission’s determination allowing this item as an offset is accordingly reversed.
*63 HAKDWARE, GLASS, OILS, PAINT — $1,156.63
The first nine items going to make up part of tbe above amount are reported by tbe G. A. O. (pp. 245-248) to bave been furnished pursuant to identical provisions in nine appropriations acts. Tbe provision in question is one already referred to, for contingent expenses for the Indian service, including travel, agency and office, etc., expense. • We note that in the case of each act, tbe paragraph preceding tbe one selected by tbe G. A. O. related to an appropriation “For buildings and repair of buildings at agencies * * We are unable to determine from the record, tbe basis for tbe selection made by the G. A. O. accountant who prepared tbe report. Because of tbe smallness of the amount involved and the absence of any indication that it was expended for tbe benefit of the tribe as a whole, it is reasonable to conclude that tbe expenditures were either for demonstration purposes or were for tbe purpose of maintaining agency buildings.
Tbe balance of tbe amount allowed as an offset ($1,114.98) is reported (pp. 270-272) to bave been expended under five appropriation acts and specifically under tbe provision in each “for education and civilization of the Indians within tbe limits of tbe late Central Superintendency, including clothing, food and lodging for tbe children attending school * * If tbe hardware, etc., was purchased for tbe repair of tbe school buildings, the expenditure would fall under the category of educational expenditures and could not be offset.
It does not appear from tbe record that any of tbe amount in question constitutes a proper offset and the Commission’s determination allowing the offset is reversed.
HOUSEHOLD EQUIPMENT AND SUPPLIES-$303.43
Four items making up most of the above total are reported (pp. 271-272) to have been expended under that provision appearing in appropriation acts for 1882, 1883, 1884 and 1885, “for education and civilization of the Indians within the limits of the late Central Superintendency, including clothing, food and lodging for the children attending school * * The remaining item of 61 cents (p. 246) was expended in 1892 under the Act of March 3, 1891, and is re *64 ported to have been authorized by that provision relative to contingent expenses of the Indian Service including travel and incidental expenses of agents, etc.
Our comments in connection with the “Hardware, glass, oils and paint,” offset above, are equally applicable to this expenditure and we conclude that this expenditure does not constitute a proper offset. The Commission’s determination is accordingly reversed.
CARE AND FEED OF LIVESTOCK-$397.45
The G. A. O. report (p. 245) indicates that $396.45 was disbursed in 1886 and 1887 under appropriation acts for those years from funds authorized for payment of contingent expenses of Indian agents and their offices, etc., as above. The balance of $1.00 is reported (p. 264) to have been disbursed in 1862 under the appropriation Act of March 2, 1861, from a fund provided “for provisions for Indians.” Nothing in the record indicates that these expenditures were made for thé benefit of the whole tribe and we therefore assume either that, the livestock in question belonged to the agency, or that some individual Indian may have been benefited by the small expenditure. The Commission’s determination allowing this amount to be offset is reversed.
BUILDING MATERIAL-$ 19.45
This consists of a single expenditure made in 1885 and is reported (p. 272) to have been made under the Act of July 4, 1884, 23 Stat. 76, 90,1 “for education and civilization of the Indians within the' limits of the late Central Superintendency, including clothing; food and lodging for the children attending school * * In the absence of a showing to the contrary, we find that this sum was expended for agency purposes or as ah aid to education. The allowance of this amount as an offset is reversed.
PRESENTS TO INDIANS — $721.48
All but $240.55 of the above amount was reported (p. 259} to have been expended under identical provisions appearing in appropriation acts for fiscal years 1824, 1825, 1828, 1831, and 1833, and l83l In each case the provision read, *65 “For presents to Indians as authorized by the Act of one thousand eight hundred and two.” The Act of March 30, 1802, 2 Stat. 139, entitled “An Act to regulate trade and intercourse with the Indian tribes, and to preserve peace on the frontiers,” provided in Section 13:
And be it further enacted, That in order to promote civilization among the friendly Indian tribes, and to secure the continuance of their friendship, it shall be lawful for the President of the United States, to cause them to be furnished with useful domestic animals, and implements of husbandry, and with goods or money, as he shall judge proper, and to appoint such persons, from time to time, as temporary agents, to reside among the Indians, as he shall think fit: Provided, that the whole amount of such presents, and allowance to such agents, shall not exceed fifteen thousand dollars per annum.
Under the Act of July 26, 1866, 14 Stat. 255, 256, $240.55 was expended (p, 259) under the general provision “For the current and contingent expenses of the Indian department,” namely, “For presents to Indians, five thousand dollars.”
The other expenses enumerated in that provision included pay of superintendents, sub-agents, clerks, interpreters, for agency buildings, etc.
From the above it appears that the funds expended for presents was primarily for the benefit of the United States and was considered an administrative expense of the Indian service. In addition, it is reasonable to conclude that the presents themselves were made to certain individual members of the tribe and not to the tribe as a whole. We do not believe that such expenditures constitute proper offsets and the Commission’s determination is reversed.[7]
PROVISIONS, 1825 TO 1889 — $9,312.75
The Commission has allowed as an offset $9,312.75 expended for provisions for the Quapaws in 42 different years from 1825 to 1889.[8] Appellant tribe objects to the allowance of $2,054.94 expended under the Act of May 26,1824, 4 Stat. 41, which act was entitled “An Act making an appropria *66 tion towards the extinguishment of the Quaupau [sic] title to lands in the territory of Arkansas.” Since this expenditure was made prior to the date of the treaty under which the claim arose, it is not a proper offset. The same objection applies to the item of $260.84 expended for provisions under the Act of May 26, 1824, 4 Stat. 36, an appropriation act for the military service for the year 1824. Appellants also object to the allowance of $459.95 expended pursuant to the Act of March 3,1825, 4 Stat. 92. The G. A. O. report states that this amount was disbursed under a provision entitled “Annuities to Quapaw Indians,” from an appropriation in the amount of $19,872. This appropriation covered, among other things “For the purchase of provisions for six months, as provided for by the fifth article of said treaty [November 15, 1824] fifteen thousand three hundred and seventy-two dollars.”[9] Why the G. A. O. report states that this amount for provisions was paid from the “annuity” paragraph, we cannot tell. We are of the opinion that it was paid from that sum appropriated for the purchase of provisions for six months. In any event, the payment appears to be “on the claim” and therefore a proper offset.[10]
With respect to the remaining expenditures for provisions,, they appear to have been for the benefit of the whole tribe, not in fulfillment of any treaty obligation, and not falling within any of the exceptions heretofore noted. Accordingly, the Commission’s determination allowing offsets in the resulting amount of $6,997.47 is affirmed.
PURCHASE OE LAND, 1938-$18,815
The Commission has allowed as an offset the above amount disbursed by the Government for the purchase of land for the Quapaws. The disbursement (p. 239) was made under the *67 Act of August 9,1937, 50 Stat. 564, 573, which, provided that such land might be acquired in accordance with the provisions of the Act of June 18, 1934, 48 Stat. 984. The latter act authorized the Secretary of the Interior to acquire any interest in lands, etc., within or without existing Indian reservations, for the purpose of providing land for the Indians. Section 15 of that Act provided that no expenditure for the benefit of Indians made out of appropriations authorized by that Act should be considered as offsets in any suit brought to recover upon any claim of such Indians against the United States. Nelying on such Section 15, appellant tribe urges that the 1938 disbursement for the purchase of land under the 1934 Act may not be offset in the present suit. Defendant points out, however, that Section 2 of the Indian Claims Commission Act of 1946 provides that expenditures made under Section 5 of the 1934 Act, may be offset against a suit brought under the Indian Claims Commission Act. We agree with defendant that the later legislation is valid and controlling and accordingly affirm the Commission’s holding that the expenditure is a proper offset.
TRANSPORTATION EXPENDITURES
The Commission has allowed as an offset expenditures made for the transportation of certain of the items discussed above. In those instances where we have held that the expenditure for the particular item itself was not a proper offset, expenditures for the transportation of such item must also be disallowed as an offset, as follows:
Agricultural implements, etc_$338. 33
Clothing_ 55.48
Fuel_ 26. 01
Hardware, etc_ 282.19
Household equipment_ 158.19
Building material_ 35. 47
Total_ 895. 67
Inasmuch as the expenditures for transportation of “Provisions” were all made in connection with provisions furnished after the date of the treaty under which appellant tribe’s claim arose, the full amount expended for such transportation is a proper offset — $294.30.
*68 The last item allowed by the Commission as an offset in this schedule was $96.21, expended for transportation of supplies, for mills and shops, etc. Small disbursements ranging in amounts from $1.51 to $28.17, during the years 1881, 1882, 1885, 1891, 1898, 1900, 1901 and 1903, were made pursuant to identical language in the various appropriation acts applicable to those years:
For transportation of Indian supplies:
For this amount, for necessary expenses of transportation of such goods, provisions, and other articles, for the various tribes of Indians provided for by this act Cjj $ * *
In each of the above Acts there also appeared the following provisions for the Quapaws:
For education, during the pleasure of the President, per third article of treaty of May thirteenth, eighteen hundred and thirty-three ~ dollars;
dFor blacksmith and assistants, and tools, iron and steel for. blacksmith-shop, per same article and treaty * * * dollars; [see for example Act of May 11, 1880, 21 Stat. 114, 124.]
dWe are of the opinion from the record that the expenditures in question were made in fulfillment of the above treaty obli- gation to furnish the Quapaw with supplies for the black- smith-shop and as such would not be a proper item of offset.
dIn 1931, 23 cents was expended (p. 267) for transportation of supplies to the Quapaw under the Act of May 14, 1930, 46 Stat. 279, 283. Inasmuch as it appears from other por- tions of that Act that the third article of the 1833 treaty was still in full force and effect, this expenditure falls in the same category as those discussed above and should not be
aThe Commission’s determination on this item is reversed.
aIn summary, the Commission’s determination allowing as offsets the following items and amounts is affirmed:
aExpenses of Indian delegations_ $468.
56 Provisions_
6,997.47 Purchase of
Land-18,815.00 Transportation of provisions_
294.30 Total.
*69 The Commission’s determination allowing as offsets the following items and amounts is reversed:
Agricultural implements and equipment, 1879 to 1901_$1, 653.28
Clothing, 1833 to 1894_ 249.41
Fuel and light_ 29.10
Hardware, glass, oil, paint_ 1,156. 63
Household equipment & supplies_ 303.43
Care and feed-livestock_ 397. 45
Building material_ 19.45
Presents to Indians_ 721.48
Provisions (prior to treaty of 1824)_ 2,315.28
Transportation of:
Agricultural implements_ 338.33
Clothing- 55. 48
Fuel_ 26.01
Hardware_ 282.19
Household equipment_ 158.19
Building material_ 35.47
Mills and shop supplies_ 96.21
Total_ 7, 837. 39
In finding 18, the Commission found that for the period from July 1, 1871, to June 30, 1946, the Quapaw Tribe was under the jurisdiction of the Quapaw Agency which also had under its jurisdiction a number of other tribes; that while the number of Indians at that agency fluctuated somewhat, there was a general increase in the population, including the population of the Quapaw tribe. The Commission concluded that on the average the Quapaw comprised 16.41 percent of the entire Indian population under the Quapaw Agency for the years mentioned.
In finding 19, the Commission found that during the period from 1871 to 1886 there was expended for provisions for all Indians under the Quapaw Agency $5,055.57, and that during the years 1878 to 1945, $8,636.60 was expended for the same purpose. The Commission allowed as an offset the Quapaw’s proportionate share of the total expended ($8,692.17), or $1,426.38. The Commission’s determination allowing this amount as an offset is affirmed.
In finding 20, the Commission found that $26,999.12 had been gratuitously expended for the Indians under the Qua-paw Agency and that the Quapaw’s share of such expenditure, or $4,430.55, constituted a proper offset. As we have *70 done under finding 17, we shall discuss separately each item allowed as an offset.
CLEARING, BREAKING AND FENCING-$28
This item is reported (G. A. O., p. 374) to have been disbursed under the Act of May 17,1882,22 Stat. 68, 83, authorizing the expenditure “For education and civilization of the Indians within the limits of the late Central Superintendency, including clothing, food and lodging for the children attending school * * So far as appears in the record, this small sum was probably expended for educational or demonstration purposes and is not a proper offset.
DIGGING WELLS AND WELL EQUIPMENT — $21
This expenditure is reported (pp. 272, 274) to have been made under the Act of March 3, 1881, 21 Stat., 485, 499 and the Act of May 17,1882, 22 Stat. 68, 83, “For education and civilization,” etc., as above. For the reasons stated above this is not a proper offset.
PLANTING AND HARVESTING CROPS — $51.91
This disbursement was made under a similar provision in the Act of February 17,1879, 20 Stat. 295, 313, and is not a proper offset.
SEEDS, FRUIT TREES, FERTILIZER-$291.05
Of the above amount $3.00 was expended (p. 333) under the Act of June 28, 1941, 55 Stat. 303, 315, in which it was provided as follows:
For the purpose of developing agriculture and stock raising among the Indians, including necessary personnel, traveling and other expenses, and purchase of supplies and equipment, $705,000, of which not to exceed $15,000 may be used to conduct agricultural experiments and demonstrations on Indian school or agency farms and to maintain * * *.
In 1881, $90.95 of the above amount was disbursed (p. 336) from the so-called Civilization Fund established by the Osage Treaty of September 29,1865, 14 Stat. 687. The remaining .$197.10 was expended (p. 372) in 1882 pursuant to the Act *71 of March 3, 1881, 21 Stat. 485, 499, “For the education and civilization,” etc.
The above amounts appear to have been expended for demonstration and educational purposes and are not proper offsets.
AGRICULTURAL IMPLEMENTS AND EQUIPMENT — $1,382.23
In 1939, $6.00 was disbursed (p. 332) under the Act of May 9, 1938, 52 Stat. 291, 301, 302; and, in 1943, $2.00 was disbursed (p. 334) under the Act of July 2, 1942, 56 Stat. 506, 516, pursuant to identical provisions to that set forth above in connection with the first expenditure for seeds, fruit ■trees, etc.
In 1880, $50 was disbursed (p. 336) for this purpose from the above-mentioned Civilization Fund.
In 1883, $4.55 was disbursed (p. 338) under the Act of May 17, 1882, 22 Stat. 68, 70, pursuant to a provision for contingent expenses of the Indian service.
In 1880, 1881, and 1885 (pp. 372-374), the balance was disbursed under an identical provision in three appropriation acts, that is, “For education and civilization * *
The entire amount appears to have been expended for educational purposes and is not a proper offset.
TRANSPORTATION OF AGRICULTURAL IMPLEMENTS AND EQUIPMENT — $460.77
Inasmuch as we have held that the agricultural implements and equipment were furnished for educational purposes and therefore not subject to offset, the expense of transporting such equipment may not be offset.
EXPENSES OF INDIAN DELEGATIONS — $2.87
We think that this expense constitutes a proper item of offset for the reasons expressed in connection with a similar item in finding 17.
HUNTING AND FISHING EQUIPMENT — $9
This particular item was disbursed' (p. 374) under the Act ■of May 17,1882,22 Stat. 68, 83. The G. A. O. report states (p. 418) that it was expended pursuant to that provision *72 authorizing the expenditure of $18,000 “For education and civilization of the Indians within the limits of the late Central Superintendency, including clothing, food, and lodging for the children attending school * * Despite the above-quoted language of the statute, we doubt that the United States would deem it necessary to spend funds to teach an Indian to hunt or fish. In the unlikely event that an Indian needed such instruction, he could scarcely avoid receiving it from other members of his tribe. On the whole, the Government has found it advisable to expend funds to wean Indians away from their tendency to devote themselves to hunting and fishing and to persuade them to grow crops and engage in at least semi-industrial pursuits. We believe this is a proper offset.
INDIGENT INDIANS, BOARD AND FUNERAL EXPENSE — $54.44
This item does not appear to fall within any of the exceptions enumerated in the statute or discussed in the applicable cases, and is, we think, a proper offset.
LIVESTOCK
Feed cmd care of — $$¡$76.96.—In the Menominee case, supra, we stated that in the absence of any showing as to just what was the purpose of expenditures for feed and care of livestock, we would assume that they were for the purpose of demonstration and were educational. The G. A. O. report in evidence in the instant case states (pp. 389-341) that sums ranging from $16.35 to $518.44 were disbursed in 1886, 1887, 1889, 1890, 1891, 1892 and 1894, under applicable appropriation acts. The provision in each act, selected by the G. A. O. as authority for the expenditures, was the one for contingent expenses of the Indian service, including travelling and incidental expenses of Indian agents, and of their offices, etc., hereinbefore referred to. We note that in each of the appropriation acts referred to there also appears a provision for the “Support of Schools” which contains an appropriation, in substantially the same language in each case, reading as follows: >
For support of Indian day and industrial schools, and for other educational purposes not hereinafter pro *73 vided for * * * dollars; for the construction on Indian reservations of school buildings * * * dollars; and for purchase of horses, cattle, sheep, and swine, for schools * * * dollars; * * *. [See, for example, 26 Stat. 1012.]
In the light of the above provision and in the absence of any other evidence from defendant bearing on the purpose of the expenditures, we hold such expenditures to have been for educational purposes and, as such, are not proper offsets. The same is true of the remaining items in this category involving disbursements (pp. 372, 374, 375) in the years 1881, 1883, 1884, 1885 and 1886, under that provision in the applicable appropriation acts which authorizes funds “Nor education and civilization of the Indians within the limits of the Late Central Superintendency * *
TRANSPORTATION OF FEED OF LIVESTOCK — $357.74
■ The items going to make up the above expenditure were disbursed (p. 325) pursuant to a provision in the applicable appropriation acts (p. 418) authorizing funds for “transportation of such goods, provisions, and other articles for the various tribes of Indians provided for by this act * * Inasmuch as we have held that the feed was purchased for educational purposes, it follows that the expense of its transportation falls in the same category and is not a proper offset.
RECOVERY OF STRAYED OR STOLEN LIVESTOCK-$14.50
This item was disbursed in 1882 under the Act of March 3, 1881, 21 Stat. 485, 499, pursuant to the provision authorizing the expenditure of funds “for education and civilization of the Indians within the limits of the late Central Superintendency * * For the reasons stated above, we conclude that this also is not a proper offset.
PAY OF HERDERS AND STOCKMEN-$2,215.22
This item was disbursed (pp. 373, 374) in 1880,1881,1882, 1883, 1884 and 1885, under applicable appropriation acts. The G. A. O. report indicates that authority for these expenditures is to be found in the provision “For education and civilization of the Indians within the limits of the late Central Superintendency * * Inasmuch as the live *74 stock in question appears to have been acquired as part of the educational program for the Quapaws, this expense, as well as the others above discussed, incurred in connection with the program, may not be offset.
BLACKSMITH SHOPS — $1,272.10
The G. A. O. report indicates (pp. 272, 274) that $184.61 of the above amount was paid under appropriation acts for the years 1880,1881,1882 and 1883 (pp. 417, 418), under the above mentioned provision “For education and civilization of the Indians within the limits of the late Central Superintendency, including * * *.” The amount of $46.37 is reported (pp. 339, 340, 342) to have been disbursed in 1887, 1889, and 1895 (p. 407), under the provisions in the applicable appropriation acts for “contingencies of the Indian service, including traveling and incidental expenses of Indian agents, and of their offices,” etc. In 1920, $60 was expended (p. 350), under the provision for general expenses of the Indian service, etc., in the appropriation act for that year (p. 408). We note that in each of the appropriation acts mentioned there was a provision appropriating funds for fulfilling the Quapaw treaty of May 13, 1833, 7 Stat. 425, “For blacksmith and assistants, and tools, iron and steel for blacksmith shop, per same [III] article and treaty * * * dollars,” or a substantially similar provision. We do not know on what theory the G. A. O. determined that the expenditures in question for blacksmith shops were made under the provisions indicated in its report, and we are of opinion that it is more likely that the shop expenses were paid out of the funds specifically appropriated for that purpose in fulfillment of the treaty obligation.
The amount of $871.36 is reported (p. 371) to have been expended from 1933 to 1941, inclusive, under provisions in appropriation acts (p. 417) for those years authorizing expenditures “For general support of Indians and administration of Indian property, including pay of employees * * * dollars.” These acts contain no provision for fulfilling treaty stipulations with the Quapaw tribe. In this connection we note that the 1833 treaty provides in Article III that “the *75 farmer and the blacksmith and the aboye appropriation for education purposes to be continued only as long as the President of the United States deems necessary for the best interests of the Indians.” This article of the treaty appears to have been mentioned in an appropriation act for the last time in the appropriation act for the fiscal year 1932,46 Stat. 1137. However, substantial sums were expended thereafter for blacksmith shops and blacksmiths and we can only assume that the President continued to deem it necessary “for the best interests of the Indians.” We conclude that these expenditures were made in fulfillment of treaty obligation and are therefore not proper offsets.
CARPENTER SHOP — $40
In 1881, $25 was expended (pp. 338, 342) under the Act of May 11,1880, 21 Stat., 114,117, and $15 in 1896 under the Act of March 2,1895, 28 Stat. 876, 878, pursuant to the provision “For contingencies of the Indian service, including traveling and incidental expenses of Indian agents, and of their offices,” etc. (p. 407.) While the carpenter shop may have been, to some extent, of assistance to the Indians, it appears that it was maintained primarily as an agency or administrative service and since the record furnishes no basis for an allocation, we cannot charge this amount to the Indians. It is therefore disallowed as an offset.
MACHINE SHOPS — $ 9 5. 51
The above sum is reported (p. 374) to have been disbursed under the Act of July 4,1884, 23 Stat. 76, 90 (p. 417), “For education and civilization of the Indians within the limits of the late Central Superintendency,” etc. We think that what we have said respecting the carpenter shop is equally applicable to the machine shop expense and the expenditure may not be offset.
SAW MILL-$851.98
A small part of the above sum is reported (p. 339) to have been expended in 1884 and 1887 under applicable appropriation acts “For contingencies of the Indian service [p. 407], *76 including traveling and incidental expenses of Indian agents, and of their offices,” etc. The balance was expended (p. 874), in 1888 and 1885, under applicable acts (p. 418) “For education and civilization * * * Indians * * * Central Superintendency,” etc. This also appears to have been as much an agency expense as one for the benefit of the tribe and in the absence of a showing of a proper basis for allocation, the amount may not be offset.
SUPPLIES AND EQUIPMENT POE MILLS AND SHOPS-$378.82
In view of our holding with respect to the shops themselves, the sums expended for supplies and equipment may not be offset.
PAX OP MILL AND SHOP EMPLOYEES
The G. A. O. report indicates that expenditures for the pay of sawmill watchman, $941.97 (p. 374); sawyer, $1,842.86 (p. 374); woodworker, $582.90 (p. 373) ; and wagonmaker, $1,850 (pp. 373, 374); were disbursed under appropriation acts from 1881 through 1885 (p. 417), pursuant to the provision “For education and civilization * * * Indians * * * Central Superintendency,” etc. What we said respecting the expenditures for supplies and equipment for the mills and shops is equally applicable to these items and the amounts in question may not be offset.
We note that in the Menominee case we allowed as an offset all mill expenses. The Menominee Indians were, at the time in question, engaged in a profitable lumber business and the Government was under no obligation, treaty or otherwise, to finance their mills.
SURVEYING AND ALLOTTING-$5
This amount was expended (p. 346) in 1907, pursuant to the provision in the appropriation act (p. 407) for that year “For contingencies of the Indian service,” etc. We know of no obligation on the part of the United States to perform this service, and accordingly the offset is a proper one.
*77 MISCELLANEOUS INDIAN SUPPLIES — $132.70
This item would appear to be a proper matter for offset only if the supplies in question were for the Indians. The provisions noted by the G. A. O. report (p. 416), under which the expenditures were made, covered general agency and administrative expenses and in the absence of any showing that this item was not for that purpose, we must assume that it was, and disallowed the offset.
SUPPLIES POE AGRICULTURAL AID-$45.12
Inasmuch as we have held that the agricultural aid rendered this tribe was educational in nature,- expenditures for supplies for such aid would not be proper offsets.
Hardware, glass, oils, paints_ $250. 36
Hardware, glass, oils, paints_ 829.45
Household equip. & supplies_ 194. 79
Household equip. & supplies_ 664.19
Building material_ 1, 354.39
Building material___ 6.85
Fuel ----1,312.33
In connection with the Commission’s finding 17, we disallowed as offsets disbursements for the above items on the ground that the purposes for which the sums were expended appeared to be agency or administrative, or in connection with the repair and maintenance of schools. An examination of the G. A. O. report on the instant items furnishes no basis for ruling differently and accordingly the Commission’s determination allowing these sums as offsets is reversed.
PAT OP LABORERS— $5,745.35
Part of the above sum is reported (pp. 842-347) to have been disbursed in the years 1895 through 1910 under appropriation act (p. 407) provisions “For contingencies of the Indian Service, including traveling and incidental expenses of Indian agents, and of their offices. * * * for pay of employees not otherwise provided for * * Any laborers paid from that fund would appear to have been rendering service to the Indian agents by way of administrative ex *78 pense, and not to the Indians. The balance of the sum is reported (pp. 373, 374) to have been expended in 1882,1883, 1884 and 1885, under the provision (p. 417) “For education and civilization of the Indians of the late Central superin-tenden'cy, including clothing, food and lodging for the children attending school * * We are unable to see any connection between pay of laborers and this provision, and since the burden of proving the propriety of the offset rests with the defendant who urges it, we must disallow this amount as an offset.
In summary, the Commission’s determination allowing as offsets the following items, listed in finding 20, is affirmed:
Expenses of Indian delegations-$2. 87
Hunting and fishing equipment- 9.00
Indigent Indians, board and funeral expenses-54.44
Surveying and allotting- 5. 00
Total_71.31
16.41% of $71.31_11. 70
The Commission’s determination allowing as offsets the following items listed in finding 20, is reversed:
Clearing, breaking and fencing- $28. 00
Digging wells & well equipment- 21.00
Planting and harvesting crops- 51.91
Seeds, fruit trees, fertilizer- 291.05
Agricultural implements and equipment- 1,382.23
Transportation of implements and equipment- 460. 77
Peed & care of livestock_ 2, 976.96
Transportation of feed- 357.74
Recovery of strayed or stolen livestock- 14.50
Livestock_ 61.60
Herders and stockmen_2,215.22
Blacksmith shops_ 1,272.10
Carpenter shops_ 40. 00
Machine shops_ 95.75
Saw mill_g_ 851.89
Supplies and equipment for mills & shops_ 378.82
Sawmill watchman___ 941.97
Sawyer_:--- 1,842.86
Woodworker_ 582.90
*79 Wagonmaker_$1, 850. 00
Indian supplies-„_1___ 132.70
Supplies for agricultural aid_ 45.12
Hardware, glass, oils, paints_ 250.36
Hardware, glass, oils, paints_:_ 829.45
Household equipment and supplies_ 194.79
Household equipment and supplies_ 664.19
Building material_-_ 6. 85
Building material_:_ 1,354.39
Pay of carpenter---!_ 675.01
Pay of laborers- 5, 745.35
Fuel- 1,312.33
Total- 26,927. 81
16.41% of $26,927.81_$4,418.85
To recapitulate, the Commission’s determinations that defendant is entitled to offset against the tribe’s award, certain specified amounts, are either affirmed or reversed as follows:

The Commission’s determination respecting Counts I and II is affirmed.
Certain findings and the opinion of the Commission with reference to certain items of offsets are modified and remanded to the Commission, for further proceeding in accordance with this opinion.
It is so ordered.
. MaddeN, Judge; Whitaker, Judge; and Jones, Chief Judge., concur.

 Section 2 (3) provides in part as follows :
The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe * * * (S)- claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of * * * unconscionable consideration * * *.

 Article V of the ISIS treaty provided for a perpetual annuity, and Article IX of the 1824 treaty provided for a limited annuity (for eleven years).

 At page 793 this court said :
“* » * An expenditure by the Government, in order to be a gratuity or a legal or equitable offset chargeable against the Indians, must be one with respect to which the United States has not assumed any obligation, direct or incidental, as a party to the treaty or in its sovereign capacity pursuant to the intention of the treaty.”

 In the Menominee case (p. 329), the court held that expenditures for maintenance of law and order and for transportation for that purpose were primarily in the category of “agency and other administrative” expenses; that “education” included adult education such as that given by teachers of farming and by agricultural agents, and that expenses of such nature should not to be set off; that in the absence of any showing as to just what was the purposes of the expenditures for planting and harvesting crops, seeds, fruit trees, fertilizers, agricultural implements and equipment, the court would assume that they were for the purpose of demonstration and were educational; that the same would apply to items for feed and care of livestock, transportation of livestock, transportation of supplies for agricultural aid and of agricultural implements and equipment; that the Government has the burden of proving the propriety of the offsets asserted and when an item, on the basis of the evidence submitted, may or may not have been expended for one of the purposes for which offsets cannot be made, the doubt must be resolved against the offset.

 We Raye examined the reports of the Commissioners of Indian Affairs referred to in defendant’s brief and which defendant urges demonstrate that, as a matter of general practice, agricultural implements and equipment had been for many years issued to the tribes not for so-called demonstration purposes, but for use by the Indians in the normal manner in which such implements would be expected to be used. Most of the portions referred to by defendant did not deal with the Quapaws at all. We accordingly turned to those sections of the reports which did deal with the Quapaws and found nothing therein to evidence the policy alluded to by defendant but, rather-, the contrary.

 We note that $33 was expended for this purpose in 1824 prior to the date of the treaty under which the claim arose.

 Por page references to disbursement schedules in the G. A. O. Report, see p. 236.

 “The various amounts appropriated for the Quapaws In that act totaled. $19,872 as follows:
Payments to four heads of tribe_ $2, 000
Annuity under 1824 treaty_ 1, 000
Provisions for 6 months per treaty_ 15, 372
Transportation per treaty_ 1, 000
Subagent or interpreter per treaty_ 500
$19, 872

 Other “payments on the claim” were discussed by • the Commission in. connection with its finding 14.